**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **Sam Mockert,** *on individually and on behalf of all others similarly situated,* Plaintiff, | **Case No. 26-2567** |
| vs. | **CLASS ACTION COMPLAINT** |
| **INSTRUCTURE, INC.**, Defendant. | **DEMAND FOR JURY TRIAL** |

Plaintiff Sam Mockert ("Plaintiff"), by and through undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons, against Instructure, Inc. ("Defendant" or "Instructure"). Plaintiff bases the foregoing allegations upon personal information and belief, the investigation of counsel, and states as follows:

## INTRODUCTION

1. On or around May 7, 2026, an unauthorized third party was able to gain access to Instructure's Canvas platform. Canvas is a web-based, learning-management platform. This breach was so substantial that it: forced Instructure to shut down Canvas in the midst of final examinations nationwide and allowed cybercriminals to access personal

data of students and teachers in elementary, middle, and high school districts as well as colleges and universities across the United States.[1]

2. This comes after a prior cybersecurity incident confirmed by Instructure only days before on or about May 1, 2026.[2]

3. According to Instructure, the cybercriminals accessed Instructure's customers' clients' highly sensitive information including their names, email addresses, student ID numbers, private messages, and other unspecified personally identifiable information (collectively, the "Private Information" or "PI").[3]

4. The cybercriminals were able to access this Private Information by exploiting an issue related to Instructure's Free-For-Teacher accounts (the "Data Breach").[4]

5. To date, Instructure has declined to say how many individuals are impacted by the Data Breach. However, the cybercriminals involved stated they have 275 million individuals' data from nearly 9,000 schools.[5] The complete shut down of Canvas's website affected the students and staff at all of those schools.

---

[1] Hanna Park et al., *What We Know About the Canvas Hack Impacting Thousands of Schools*, CNN (May 8, 2026), https://www.cnn.com/2026/05/07/us/canvas-hack-strands-college-students-finals-week.

[2] *Confirmed Security Incident – Incident Report for Instructure*, Instructure (May 6, 2026), https://status.instructure.com/incidents/9wm4knj2r64z.

[3] *Id.*

[4] Chad de Guzman, *What to Know About the Canvas Cyberattack That's Affected Thousands of Schools*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know.

[5] *Id.*

6. Instructure is an education technology company that specializes in solutions for learning, assessment, and credentialing—including its Canvas, Mastery, and Parchment products—and offers its specialized services primarily to schools and school districts.

7. When Instructure's customers—schools and school districts—utilize its products, Instructure gains access to the data of the students and staff who attend and work at those schools, including their Private Information.

8. The amount of Private Information Instructure has access to is immense. Instructure's Canvas product alone has more than 30 million active users, with more than 8,000 institutions as customers.[6] Thousands of schools worldwide use Canvas for coursework, assignments, quizzes, exams and communication between students and instructors. Specific to North America, 41 percent of higher education institutions use Canvas to deliver courses.[7]

9. Although Instructure does not fully disclose what type of data it collects from students, teachers, and school, its public disclosures mention many kinds of data that Instructure "may" collect about its users, including the following:

a. <u>Personal Data</u>

- Student name
- Student email address

---

[6] Park et al., *supra* note 1.

[7] Kathryn Palmer, *'Pay or Leak': Hackers Target Big Higher Ed Vendor, Inside Higher Ed* (May 5, 2026), https://www.insidehighered.com/news/tech-innovation/administrative-tech/2026/05/05/pay-or-leak-hackers-target-big-higher-ed-vendor.

- Student ID number
- User role (e.g. student, teacher)

b. Optional Personal Data

- Phone numbers
- Gender
- Personal pronouns
- Messages to other students and teachers
- Avatar photos
- Descriptive information
- Links to social media

c. Institution Data

- Enrollments
- Administrators
- Course & course materials
- Assignments
- Assessments
- Institution URL
- Institution specific settings
- SIS integrations
- Institutional Wiki

- Calendars[8]

10. This type of personal and sensitive data is highly targeted by cybercriminals who seek to exploit this data for nefarious purposes. Indeed, Private Information has inherent value and is routinely marketed and sold on the dark web. In the wrong hands, the personal and sensitive information that Instructure collects and stores may be used to cause significant harm to students and their parents, including being used to orchestrate a range of fraudulent schemes.

11. The value of this information on the dark web is well recognized in the modern data economy, and the foreseeable risk to customers as a result of a cybercriminal event is known and recognized by technological companies that gather and store data, including Instructure.

12. When customers' data is accessed by cybercriminals, the affected individuals must spend a substantial amount of time, money, and other resources to monitor their credit, financial accounts, medical records, email, and mail.

13. Because it is foreseeable that exposure of Private Information to cybercriminals will result in harm to the affected individuals, Instructure has a duty to use reasonable and necessary data security practices to protect the private, sensitive, and personal information that it stores.

14. If Instructure had employed reasonable and necessary data security practices, the harm to Plaintiff could have been avoided.

---

[8] *Institutions & Educators Privacy – FAQ*, Instructure, https://www.instructure.com/privacy-security/institutions-educators-faq (last visited May 8, 2026).

15. Instead, as a direct and proximate result of Instructure's failure to employ reasonable and necessary data security practices, Plaintiff and Class Members' Private Information is known to cybercriminals.

16. Plaintiff and Class Members, now face a substantially increased and certainly impending risk of fraud, identity theft, intrusion into medical information, misappropriation of health insurance benefits, Private Information being shared on the dark web, and other forms of criminal activity. The risk of this harm may remain for the rest of Plaintiff and Class Members' lives.

17. Plaintiff and Class Members have also suffered concrete injuries in fact including, but not limited to, lost or diminished value of Private Information, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, loss of benefit of the bargain, lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, and actual misuse of the compromised data consisting of an increase in spam calls, texts, and emails.

18. Because of the injuries Plaintiff and Class Members have already endured and continue to face, they must continue to spend money, time, and other resources to protect themselves from these crimes.

19. Further, Plaintiff and Class Members face additional hardship in their ability to mitigate the harm resulting from the Data Breach because Instructure has failed to conduct any meaningful investigation into the Data Breach and the specific information that was accessed. Without more specific information about the Data Breach, Plaintiff and

Class Members' ability to protect themselves from the harm resulting from the Data Breach is compromised.

20. Plaintiff, on behalf of himself and all others similarly situated, therefore brings claims for (i) Negligence; (ii) Negligence *Per Se*; (iii) Breach of Implied Contract; (iv) Breach of Fiduciary Duty; (v) Invasion of Privacy; (vi) Declaratory Judgement; and (vii) Unjust Enrichment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonable and necessary data security practices to protect the Private Information in Instructure's custody and prevent future data breaches.

## PARTIES

21. Plaintiff Sam Mockert is a citizen of the United States residing in Minneapolis, Minnesota. He is a student at the University of Minnesota and as such, he is a user of Defendant's Canvas product. He experienced Defendant's shut down of Canvas during the height of finals testing.

22. Defendant Instructure, Inc. is a Delaware corporation with its headquarters located at 6330 S 3000 E, Suite 700, Salt Lake City, UT 84121.

## JURISDICTION & VENUE

23. This Court has subject matter jurisdiction over this case pursuant to the Class Fairness Act of 2005, 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members

and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than one or more Defendant.

24. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

25. This Court has personal jurisdiction over Defendant because Instructure has sufficient minimum contacts with Minnesota, Instructure conducts business in this District by targeting, offering, and providing its educational services and products to schools, teachers, and students within this District.

26. Venue is proper in this District because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District and Defendant has harmed Class Members residing in this District.

## BACKGROUND

### A. Defendant Collects Personal and Sensitive Information

27. Instructure is an education technology company that advertises itself as providing educational products to schools and school districts.

28. Plaintiff and Class Members are current and former students and students' parents of Instructure's customers, as well as teachers.

29. In exchange for receiving educational support and/or employment services from Instructure, students, students' parents, schools, and teachers entrust Instructure with highly sensitive and private personal information.

30. Without the required disclosure of Private Information from Plaintiff and Class Members, Instructure could not perform the services it provides.

31. Instructure collects highly sensitive PI, including student names, ID numbers, email addresses, private messages, and a myriad of additional personal, identifying information from students and teachers.

32. This highly sensitive PI is held, unencrypted, in Instructure's computer systems.

33. Students, students' parents, schools/universities, and Instructure's employees reasonably expect Instructure to safeguard their highly sensitive PI and to keep it secure and confidential.

34. Upon information and good faith belief, Instructure promised and represented to its customers and their clients that the PI collected from them as a condition of obtaining Instructure's educational support services would be safeguarded and kept secure and confidential and would be deleted after Instructure was no longer required to maintain it.

35. Because the data Instructure stores is highly sensitive and personal in nature, Instructure is required to keep this PI private, comply with industry standards related to data security, comply with all laws protecting PI, and provide notice to affected individuals if their PI is disclosed without authorization.

36. By obtaining, collecting, using, and benefiting from Plaintiff and Class members' PI, Instructure assumed legal and equitable duties owed to them and knew or should have known that it was responsible for protecting their PI.

37. Plaintiff and Class Members relied on Instructure to keep their PI confidential and securely maintained, which Defendant ultimately failed to do.

38. Upon information and good faith belief, Defendant's actions and inactions directly resulted in the Data Breach and the compromise of Plaintiff and Class Members' PI.

**B. Instructure's Inadequate Data Security Measures Exposed Plaintiff and Class Members' PI**

39. On or around May 1, 2025, Instructure confirmed that it experienced a cybersecurity incident that allowed cybercriminals to access personal data stored on its systems.[9]

40. Specifically, Instructure confirmed that cybercriminals stole the Private Information of students, including names, email addresses, student ID numbers, private messages, and other unspecified personally identifiable information, from schools using its Instructure Canvas platform.[10]

41. According to multiple media reports, Instructure's Canvas platform was again breached on or around May 7, 2026, which forced Instructure to shut Canvas down in the midst of final exams at schools nationwide.[11]

42. Instructure has not disclosed the identity of the cybercriminals behind this Data Breach, how many schools and individuals were impacted, or the full extent of remedial measures it is undertaking to ensure the breach does not happen again.

[9] *Confirmed Security Incident – Incident Report for Instructure*, *supra* note 2.

[10] *Id.*

[11] Park et al., *supra* note 1; *see also* de Guzman, *supra* note 4.

43. Instructure is obligated by the FTC Act, contract, common law, and industry standards to safeguard Plaintiff and Class Members' PI and prevent it from being disclosed to unauthorized persons.

44. As a direct result of Instructure's failure to implement reasonable and necessary data security practices, the Data Breach occurred.

**C. The Data Breach was Preventable**

45. Instructure failed to implement reasonable and necessary data security practices to protect the PI it collects and manages, such as encrypting the information or deleting it when it was no longer needed.

46. This failure to implement reasonable and necessary data security practices cannot be attributed to a lack of knowledge or guidance for protecting PI. The United States Government has provided numerous recommendations to prevent and detect cyberattacks.

47. The FTC has many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) segmenting networks; (6) monitoring activity on networks to uncover unapproved activity; (7)

verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[12]

48. The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data. The body of law created by the FTC recognizes that failure to restrict access to information and failure to segregate access to information may violate the FTC Act.

49. FTC orders that preceded Instructure's Data Breach further clarify the measures businesses must take to meet their data security obligations. The FTC has issued the following orders against businesses that failed to employ reasonable measures to secure sensitive data: *In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect

[12] *Start With Security, A Guide for Business*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Jan. 12, 2025).

and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc*., No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . .").

50. In addition to FTC guidance, Instructure was aware of industry best practices to prevent cyberattacks. These practices include, but are not limited to, educating all employees on cybersecurity best practices; implementing strong passwords; having multi-layer security, including firewalls, anti-virus, and anti-malware software; using encryption technology; using multi-factor authentication; and limiting the number of employees who have access to sensitive data. Instructure failed to follow these industry best practices, including using multi-factor authentication.

51. Other industry best practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

52. Upon information and belief, Instructure failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security

Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

53. These frameworks apply in any industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the hackers and causing the Data Breach.

54. As an entity that collects and stores highly sensitive information, Defendant could and should have been implementing the recommended measures to prevent and detect cyberattacks.

55. The occurrence of the Data Breach indicates that Defendant failed to adequately implement industry-accepted measures to prevent and detect cyberattacks, resulting in injury to Plaintiff and Class Members.

**D. Instructure's Data Breach Caused Plaintiff's and Class Members' Injuries**

56. Instructure's Data Breach resulted in the theft and exposure of confidential data, including email addresses, student ID numbers, private messages, and other PI. Exposure of this type of data puts individuals at a significant and prolonged risk of fraud and identity theft. Personal information like that stolen from Instructure is valuable and has been commoditized in recent years because of its use in conducting identity theft and fraud.

57. After a data breach like the one Instructure allowed, the hackers responsible for the breach seek to sell the stolen personal and sensitive records on the black market to purchasers looking to use the personally identifying information to create fake IDs, make

fraudulent transactions, submit false medical claims for reimbursement, obtain loans, or commit other acts of identity theft.[13]

58. The ramifications of Instructure's failure to keep Plaintiff and Class Members' PI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, Social Security number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

59. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

60. Stolen PI is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal identities and online activity.

61. Once PI is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PI being harvested from the victim, as well as PI from family, friends and colleagues of the original victim.

62. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and

[13] *How do hackers make money from your stolen data?,* EMISOFT (Feb. 20, 2020), https://blog.emsisoft.com/en/35541/how-do-hackers-make-money-from-your-stolen-data/.

dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

63. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiff and Class Members that their PI was stolen.

64. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

65. Data breaches facilitate identity theft as hackers obtain consumers' PI and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PI to others who do the same.

66. Victims of identity theft often suffer indirect financial costs as well, including the costs incurred due to litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit.

67. In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of identity theft, and the emotional toll identity theft can take, some victims have to spend considerable time repairing the damage caused by the theft of their PI. Victims of identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

68. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PI. To protect themselves, Plaintiff and

Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

69. Consumers place a high value on their PI and a greater value on their PHI, in addition to the privacy of their personal information. Research shows how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US $30.49–44.62."[14]

70. By virtue of the Data Breach and unauthorized release and disclosure of the PI of Plaintiff and the Class, Instructure deprived Plaintiff and Class Members of the substantial value of their personal information, to which they are entitled. As previously alleged, Instructure failed to provide reasonable and necessary data security, pursuant to and in compliance with industry standards and applicable law.

71. As a direct and proximate result of Instructure's wrongful actions and omissions here, Plaintiff and Class Members have suffered, and will continue to suffer, ascertainable losses, economic damages, and other actual injury and harm, including: (i) the resulting immediate and continuing risk of future ascertainable losses, economic damages, and other actual injury and harm; (ii) the opportunity cost and value of lost time they must spend to monitor their financial accounts and other accounts—for which they are entitled to compensation; (iii) out-of-pocket expenses for securing identity theft protection and other similar necessary services; (iv) the diminution in value of their Social

[14] Il-Horn Hann et al., *The Value of Online Information Privacy* (Oct. 2002), http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

Security numbers and other private information, the value of which is derived from its confidentiality and privacy; and (v) emotional distress caused by the impending risk of fraud and identity theft and the loss of privacy, confidentiality, and value of their personal information.

## PLAINTIFF'S EXPERIENCE

72. Plaintiff Sam Mockert attends a university that utilized Instructure's Canvas platform.

73. In order for Plaintiff to attend school and adequately participate in his classes, Plaintiff was required to provide their Private Information to Instructure, including name, contact information, and other sensitive information.

74. At the time of the Data Breach—May 2026—Instructure maintained Plaintiff's Private Information on its system.

75. Plaintiff takes precautions to avoid sharing his Private information. For example, Plaintiff keeps documents containing his Private Information in a secure location. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted Instructure with his Private Information to Defendant, or even used Defendant's services, if he had known that Defendant used inadequate data security practices.

76. On May 7, 2026, Plaintiff, like thousands of other students nationwide, was unable to access Canvas to adequately participate in or prepare for classroom activities.

77. Based on the information that Instructure has provided to the public, impacted schools had Private Information of students exposed to cybercriminals in the Data

Breach, and this information included students' names, email addresses, ID numbers, and private messages between teachers and students.[15]

78. Accordingly, Plaintiff had his Private Information exposed to cybercriminals, including his name, email addresses, student ID number, and private messages.

79. Plaintiff has made reasonable efforts to mitigate the injury of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services, and monitoring his financial accounts for fraudulent activity. Because the risks associated with the Data Breach—like fraud and identity theft—are ongoing, Plaintiff will continue to spend time attempting to mitigate the injury of the Data Breach.

80. The substantial amount of time Plaintiff has spent, and will continue spending, on these efforts could have otherwise been spent doing other activities, like work or recreation. The time Plaintiff has lost cannot be recovered.

81. Plaintiff has suffered actual injury from having his Private Information compromised as a result of the Data Breach, including, but not limited to the following:

a. Invasion of privacy;

b. Theft of Private Information;

c. Lost or diminished value of Private Information;

d. Lost time and opportunity costs associated with attempting to mitigate; the consequences of the Data breach;

[15] *Confirmed Security Incident – Incident Report for Instructure*, *supra* note 2.

e. Loss of benefit of the bargain;

f. Statutory damages;

g. Nominal damages; and

h. Continued and increased risk to Private Information

82. Plaintiff has also suffered additional injuries, such as experiencing fear, anxiety, and stress, for what the Data Breach means for himself and his Private Information. The emotional distress Plaintiff has experienced is compounded by the fact that schools and students nationwide are preparing for and taking final exams and were rendered unable to access essential classroom materials due to Canvas being shut down because of the Data Breach.[16] Defendant has still not revealed key details about the Data Breach such as how many individuals are impacted and the specific data accessed.

83. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

84. Plaintiff brings this nationwide class action on behalf of himself and all other similarly situated Class Members pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

---

[16] Park et al., *supra* note 1.

85. The Nationwide Class that Plaintiff seeks to represent is defined as follows: All individuals residing in the United States whose PI was compromised in Defendants' Data Breach which occurred in or about May 2026 (the "Nationwide Class").

86. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

87. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

88. **Numerosity**. Members of the proposed Class likely number in the thousands and are thus too numerous to practicably join in a single action. Membership in the Class is ascertainable from Defendant's own records, including but not limited to the files implicated in the Data Breach.

89. **Commonality and Predominance**. Common questions of law and fact exist as to all proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include, but are not limited to:

a. Whether Defendant engaged in wrongful conduct alleged herein;

b. Whether Defendant failed to timely notify Plaintiff and the Class Members of the Data Breach;

c. Whether Defendant's inadequate data security practices were a cause of the Data Breach;

d. Whether Defendant negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PI;

e. Whether Defendant allowed the compromise of PI obtained from the records of Defendant without the permission or consent of Plaintiff and the Class Members;

f. Whether Plaintiff and other Class Members are at an increased risk for identity theft because of the Data Breach;

g. Whether Plaintiff and the Class Members are entitled to actual, statutory, or other forms of damages, or other monetary relief; and

h. Whether Plaintiff and the Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

90. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. All Class Members were subject to the Data Breach and had their PI accessed by, used and/or disclosed to cybercriminals. Defendant's misconduct impacted all Class Members in the same manner.

91. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members he seeks to represent; he retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

92. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the Class Members pale compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

93. **Injunctive and Declaratory Relief**. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant, through its uniform conduct, acted or failed and refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to maintain inadequate security practices, retain possession of Plaintiff's and

Class Members' PI, and has not been forced to change its practices or relinquish PI by nature of other civil suits or government enforcement actions, thus making injunctive relief a live issue and appropriate to the Class as a whole.

94. Likewise, particular issues are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the claims present particular, common issues, the resolution of which would materially advance the resolution of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Plaintiff and Class Members' PI was accessed and/or acquired by cybercriminals because of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and Class Members;

c. Whether Defendant failed to take adequate and reasonable steps to safeguard Plaintiff and Class Members' PI;

d. Whether Defendant failed to adequately monitor its data security systems;

e. Whether Defendant failed to comply with applicable laws, regulations, and/or industry standards relating to data security amounting to negligence;

f. Whether Defendant's security measures were reasonable in light of data security recommendations, and other measures recommended by data security experts;

g. Whether Defendant knew or should have known it did not employ adequate and reasonable measures to keep Plaintiff and Class Members' PI secure and;

h. Whether Defendant's failure to adhere to FTC data security obligations, industry standards, and/or measures recommended by data security experts caused the Data Breach.

## LEGAL CLAIMS

## COUNT I

**Negligence**

95. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

96. Instructure owed a common law duty to Plaintiff and Class Members to exercise reasonable care in protecting their PI in Instructure's possession from being compromised, lost, stolen, accessed, and/or misused by unauthorized persons.

97. Instructure owed a common law duty to Plaintiff and Class Members to prevent foreseeable harm. Plaintiff and Class Members were the foreseeable and probable victims of any of Instructure's substandard data security practices. As someone that collects and stores PI—a valuable target for cybercriminals—Instructure was obligated to act with reasonable care to protect Plaintiff and Class Members from the foreseeable threats.

98. As someone that holds itself out as a trusted provider of educational support services and is in a superior position to protect against the harm suffered by Plaintiff, Instructure also assumed a duty to reasonably safeguard Plaintiff and Class Members' information.

99. Instructure breached the duties it owed to Plaintiff and Class Members. Accordingly, Instructure was negligent.

100. Instructure breached its duties through some combination of the following errors and omissions that allowed the Data Breach to happen:

a. Mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Plaintiff and Class Members' information that resulted in the unauthorized access and compromise of PI;

b. Mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c. Failing to design and implement information safeguards to control these risks;

d. Failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e. Failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f. Failing to detect the breach at the time it began or within a reasonable time thereafter;

g. Failing to follow its own privacy policies and practices published by Plaintiff and Class Members; and

h. Failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PI.

101. But for Instructure's negligence, Plaintiff and Class Members' PI would not have been stolen by cybercriminals.

102. As a direct and proximate result of Instructure's negligence, Plaintiff and Class Members have suffered injuries, including but not limited to:

a. Theft of PI;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts;

c. Costs associated with purchasing credit monitoring and identify theft prevention services;

d. Lowered credit scores resulting from purchasing credit monitoring and identity theft protection services;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

d. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PI being placed in the hands of criminals;

e. Damages to and diminution in value of their PI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff and Class Members' data against theft and not allow access and misuse of their data by others;

f. Continued risk of exposure to hackers and thieves of their PI, which remains in Defendant's possession and is subject to further so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members' data; Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

g. The diminished value of the services they paid for and received; and

h. Emotional distress from the unauthorized disclosure of PI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

103. As a direct and proximate result of Instructure's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT II

### Negligence *Per Se*

104. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

105. Section 5 of the FTC Act prohibits "unfair … practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Instructure for failing to use reasonable measures to protect PI. Various FTC publications and orders also form the basis for Instructure's duty.

106. Instructure violated Section 5 of the FTC Act by failing to use reasonable measures to protect PI and not complying with industry standards. Instructure's conduct was particularly unreasonable given the nature and amount of PI it obtained and stored and the foreseeable consequences of a data breach involving PI of its customers.

107. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

108. Instructure's violation of Section 5 of the FTC Act constitutes negligence *per se*.

109. The harm that has occurred as a result of Instructure's conduct is the type of harm that the FTC Act and Part 2 were intended to protect.

110. As a direct and proximate result of Instructure's negligence, Plaintiff and Class Members have been injured as described herein, and is entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT III**

**Breach of Implied Contract**

111. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

112. As part of its provision of educational support services, Instructure solicited Plaintiff and Class Members' PI. Plaintiff and Class Members accepted Instructure's offer.

113. Upon providing their PI to Instructure, Plaintiff and Class Members entered into implied contracts with Instructure, whereby Instructure agreed to take reasonable and

appropriate steps to safeguard their PI, comply with statutory and common law duties to protect their PI, and timely notify them in the event of a data breach.

114. When entering into these implied contacts with Instructure, Plaintiff and Class Members reasonably believed that Instructure had the proper practices in place to comply with its duties to safeguard Plaintiff and Class Members' PI. They also reasonably believed that Instructure would timely notify them in the event of a data breach.

115. Plaintiff and Class Members would not have provided their PI to Instructure if they had known that Instructure would fail to safeguard their PI and not provide timely notice of a data breach.

116. Instructure breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PI and not providing timely notice of the Data Breach.

117. As a direct and proximate result of Instructure's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

118. Plaintiff and Class Members are also entitled to injunctive relief requiring Instructure to employ adequate security protocols consistent with industry standards to protect Plaintiff and Class Members' PI.

## COUNT IV

### Breach of Fiduciary Duty

119. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

120. When Instructure assumed its duty to safeguard Plaintiff and Class Members' PI, Instructure became a fiduciary. As such, Instructure has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Instructure's relationship with them.

121. Plaintiff and Class Members would not have entrusted Instructure with the important task of safeguarding their PI if they had known that Instructure lacked adequate data security practices.

122. Instructure breached its fiduciary duties to Plaintiff and Class Members by failing to safeguard their PI.

123. Instructure further breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give timely notice of the Data Breach.

124. As a direct and proximate result of Instructure's breach of its fiduciary duties, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT V

### Invasion of Privacy

125. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

126. Plaintiff and Class Members had a legitimate expectation of privacy with respect to their PI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

127. Instructure owed a duty to its customers, including Plaintiff and Class Members, to keep their PI confidential.

128. The unauthorized release of PI, especially the breadth of information available here, is highly offensive to a reasonable person.

129. The intrusion was into a place or thing, which was private and is entitled to be private. Instructure stored and managed Plaintiff and Class Members' PI as part of its educational support services. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

130. The Data Breach constitutes an intentional interference with Plaintiff and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

131. Instructure acted with a knowing state of mind when it permitted the Data Breach because it knew its data security practices were inadequate and knew that it had duties to secure the trove of PI it maintains.

132. Instructure had notice, and knew, or had constructive knowledge, that its inadequate cybersecurity practices would cause injury to Plaintiff and Class Members.

133. As a proximate result of Instructure's acts and omissions, Plaintiff and Class Members' PI was disclosed to and used by third parties without authorization, causing Plaintiff and Class Members to suffer damages.

134. Unless and until enjoined and restrained by order of this Court, Instructure's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the PI maintained by Instructure can be viewed, distributed, and used by unauthorized persons.

135. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for money damages will not end the invasion of privacy for Plaintiff and the Class.

## COUNT VI

### Declaratory Judgment

136. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

137. Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

138. An actual controversy has arisen in the wake of the Data Breach regarding Instructure's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges Instructure's actions in this respect were

inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and Class Members continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

139. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Instructure owed, and continues to owe a legal duty to secure the PI with which it is entrusted, and to notify impacted individuals of the Data Breach under the common law;

b. Instructure breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' PI; and

c. Instructure's breach of its legal duty continues to cause harm to Plaintiff and Class Members.

140. The Court should also issue corresponding injunctive relief requiring Instructure to employ adequate security protocols consistent with industry standards to protect Plaintiff and Class Members' data and PI.

141. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Instructure's data systems. If another breach of Instructure's data systems occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and Class Members for their out-of-pocket and other damages that are legally

quantifiable and provable do not cover the full extent of injuries suffered by Plaintiff and Class Members, which include monetary damages that are not legally quantifiable or provable.

142. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Instructure if an injunction is issued.

143. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

**COUNT VII**

**Unjust Enrichment**

144. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein and pleads the following count in the alternative.

145. Upon information and belief, Instructure paid for its data security measures from funds that included payments made by or on the behalf of Plaintiff and Class Members.

146. A portion of these payments—an amount known to Instructure—was to be used to sufficiently safeguard Plaintiff's PI.

147. Plaintiff and Class Members conferred a monetary benefit on Instructure, and in exchange, Instructure should have employed sufficient safeguards to protect their PI.

148. Instructure knew that Plaintiff and Class Members conferred a benefit which Instructure accepted. Instructure profited from its transactions with Plaintiff and Class Members and used their PI for business purposes.

149. Notably, Instructure enriched itself by saving the costs it should have spent on data security measures to safeguard Plaintiff and Class Members' PI. Instead of using payments made by or on behalf of Plaintiff and Class Members to employ sufficient data security measures, Instructure decided to increase its own profits by using cheaper, ineffective data security measures.

150. By failing to secure Plaintiff and Class Members' PI, Instructure failed to provide full compensation for the benefit that Plaintiff and Class Members' conferred upon Defendant.

151. Instructure failed to disclose the inadequate data security practices previously alleged, and therefore acquired Plaintiff and Class Members' PI through inequitable means.

152. If Plaintiff and Class Members knew that Instructure had not reasonably secured their PI, they would not have agreed to provide their PI to Instructure.

153. Pursuant to the principles of equity and good conscience, Instructure should not be allowed to retain the money belonging to Plaintiff and Class Members due to its failure to employ sufficient data security measures.

154. Plaintiff and Class Members have no adequate remedy at law.

155. As a direct and proximate result of Instructure's conduct, Plaintiff and Class Members have suffered injuries.

156. Instructure should be compelled to disgorge into a common fund or collective trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Instructure should be compelled to refund the amount that Plaintiff and Class Members overpaid for Instructure's services.

## PRAYER OF RELIEF

Wherefore, Plaintiff, on behalf of himself and other Class Members, request this Court to award relief as follows:

a. An order certifying the class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b. An award to Plaintiff and proposed Class Members of damages with pre-judgment and post-judgment interest;

c. A declaratory judgment in favor of Plaintiff and the Class;

d. Declaratory, injunctive, and equitable relief to Plaintiff and the Class;

e. An award of attorneys' fees, costs, and litigation expenses, as allowed by law; and

f. An award of such other and further relief as the Court may deem just and proper, necessary, or appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all the claims so triable.

Dated: May 11, 2026

/s/ David A. Goodwin
Daniel E. Gustafson (#0202241)
David A. Goodwin (#0386715)
Mary M. Nikolai (#0400354)
Adam J. Kolb (#0505462)
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
mnikolai@gustafsongluek.com
akolb@gustafsongluek.com

***Attorneys for Plaintiff***